# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

BEVERLY KAYE CRABB                                    PLAINTIFF

v.                                    CIVIL ACTION NO.1:11CV44-SA-DAS

WAL-MART STORES, INC.                                    DEFENDANT

**LEAD CASE**
**CONSOLIDATED WITH**

SHERRY DENICE PHARR                                    PLAINTIFF

v.                                    CIVIL ACTION NO.1:11CV83-SA-DAS

WAL-MART STORES, INC.                                    DEFENDANT

## MEMORANDUM OPINION

Presently before the Court are two Motions for Summary Judgment [51, 48]. Because the Plaintiffs duly waived their Title VII discrimination claims and are unable to present sufficient evidence in support of their § 1981 discrimination claims, § 1981 retaliation claims, and state-law based wrongful termination claims, the Court GRANTS those motions.

## FACTUAL BACKGROUND

Beverly Crabb, Caucasian, was initially employed as a part-time cashier at Wal-Mart in Tupelo. In 2004 or 2005, she was promoted to the position of a customer service manager (CSM) and began working full time. As a CSM, Crabb was responsible for overseeing the customer checkout process. This involved both supervising part-time cashiers and personally assisting Wal-Mart customers. In October of 2009, Crabb was suspected of intentionally under-ringing merchandise for customers. Under-ringing, as defined by Wal-Mart policy, occurs when

an associate "ring[s] up merchandise for less than the actual retail price." Corporate policy deems the offense a serious infraction, potentially warranting termination.

Specifically, Wal-Mart management suspected Crabb of under-ringing merchandise for Shelly Pharr, an assistant manager at Wal-Mart who had, at that time, recently been transferred away from the Tupelo location. In the suspected incidences, Crabb scanned merchandise for Pharr, voided the scan, and then placed the items beside the register. Crabb then nonetheless placed the voided items in Pharr's bag. Thus, Pharr received merchandise that she did not pay for because those items were allegedly intentionally voided by Crabb.

Wal-Mart initiated an investigation into the alleged under-ringing violation. Store Manager Howard Brannon, Caucasian, contacted the Loss Prevention Coordinator, Dewayne Ginn, and requested that he look into the security footage from the dates in question.[1] Ginn pulled the tapes, and finding evidence of suspicious activity, passed the investigation along to his supervisor, Shannon Moore. Moore, Caucasian, was employed as the Market Asset Protection Manager and was responsible for supervising loss prevention for the entire geographic market area. Moore determined that Crabb intentionally under-scanned the items and recommended to Brannon that Crabb be terminated for gross misconduct. Brannon passed the recommendation along to Human Resources Manager Pam Barnett, Caucasian, and Market Manager Sammy Sappington, Caucasian. Although the management team reached the termination decision as a team, Sappington, as the highest manager involved, made the final decision.

Shelly Pharr, Caucasian, was first employed at Wal-Mart in 1988 and had been promoted to Assistant Manager at the Tupelo Wal-Mart around the year 2000. In August of 2009, Pharr

---

[1] At some point, Wal-Mart's title for this position seems to have changed from Loss Prevention Coordinator to Asset Protection Coordinator. The deponents therefore refer to the position as either LPC or APC.

was transferred to the Fulton Wal-Mart for reasons not associated with her performance. As an Assistant Manager, Pharr was charged with assisting in store pricing and merchandise presentation, providing supervision and accountability to hourly associates, maintaining quality assurance standards, and ensuring compliance with company policy and procedures.

In October 2009, Pharr was likewise implicated in Crabb's under-ringing incidents, but as the recipient of the goods. Wal-Mart suspected Pharr of knowingly taking goods from the store without purchasing them. The company's suspicions were further piqued by the fact that Pharr had driven approximately twenty miles from her home to make the purchases at the Tupelo Wal-Mart, that she had paid in cash, and that she had foregone using her Associate Purchase Card, which would have allowed her to receive a discount on store purchases, but would have tied each transaction to her. Brannon also initiated the investigation into Pharr's actions by requesting that LPC Ginn pull the tapes and records for her suspected purchases. Ginn forwarded those records onto Moore, who carried out the rest of the investigation. Moore also interviewed Pharr and concluded that she knowingly violated store policy. He therefore recommended that she too be terminated. This recommendation was passed to Michelle Clifton, the Fulton Store Manager, Human Resources manager Barnett, and Market Manager Sappington. Once again, Sappington served as the final decision-maker.

Crabb and Pharr each brought suit against Wal-Mart, alleging discrimination claims under Title VII and § 1981, wrongful retaliation under § 1981, and a state-law retaliation claim. The cases were consolidated in their entirety. Wal-Mart now seeks summary judgment against both plaintiffs.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

## DISCUSSION

### I.     Title VII Discrimination

As a threshold matter, the filing of an administrative complaint is a non-dispensable pre-requisite to bringing suit under the legislative protections of Title VII.  Thomas v. Atmos Energy Corp., 223 F. App'x 369, 376 (5th Cir. 2007).  To determine whether a plaintiff has exhausted all administrative remedies, the court "engage[s] in [a] fact intensive analysis of the statement given by the plaintiff in the administrative charge, and looks slightly beyond its four corners, to its substance rather than its label."  Pacheco v. Mineta, 448 F.3d 783, 789 (5th Cir. 2006).  Although the plaintiff need not "check a certain box or recite a specific incantation to exhaust his or her administrative remedies," the plaintiff must file a charge containing the crucial element of the allegation and a factual statement providing the grounds thereof.  See id. at 789; Manning v. Chevron Chem. Co., LLC, 332 F.3d 874, 879 (5th Cir. 2003).

In the case at bar, both Crabb and Pharr filed intake questionnaires with the Equal Employment Opportunity Commission (EEOC) within their statutory 180 day limitation period provided by 42 U.S.C. 2000e-5(e)(1).  The Court need not reach the question of whether such a questionnaire constituted a valid charge, however, as Crabb and Pharr admit in their responses that the EEOC charges were not timely filed.  In doing so, Crabb and Pharr accept that they did not exhaust their administrative remedies as required by Title VII and subsequently waive any right to relief provided under the statute.  Thus, the Court finds that Plaintiffs' Title VII discrimination claims fail as a matter of law, and Wal-Mart's Motion for Summary Judgment is due to be granted.

## II.    § 1981 Discrimination

Having waived their Title VII claims, Crabb and Pharr bring their discrimination claims under a parallel § 1981 cause of action.  In order to succeed on a § 1981 race discrimination claim, the plaintiff need meet the analogous requirements of Title VII.  Defenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 587 (5th Cir. 1998) (quoting LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 n.2 (5th Cir. 1996)).  Because plaintiffs have failed to provide any direct evidence of discrimination, they rely on the McDonnell Douglas burden shifting formula. McDonnell Douglas Corp v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under that framework, each plaintiff must first establish a prima facie case of discriminatory discharge by establishing that she (i) is a member of a protected class, (ii) suffered an adverse employment action, (iii) was qualified for her position, and (iv) was replaced by someone outside of the protected class or was treated less favorably than similarly situated employees outside the protected class.  Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 345 (5th Cir. 2007).  For purposes of the summary judgment motions, Defendant concedes the first three elements of the prima facie cases.  The parties virulently disagree as to the fourth and final element, however.  Specifically, the parties disagree as to whether there exists a genuine issue of material fact regarding whether Crabb or Pharr were treated less favorably than similarly situated employees outside the protected class, under nearly identical circumstances.  Lee v. Kansas City S. Ry., 574 F.3d 253, 259 (5th Cir. 2009).

In order to meet the burden necessary to satisfy the fourth prong, Crabb and Pharr must offer a sufficient comparator.  As a general matter, employees with different supervisors, who work for different divisions of a company, or who were subject to an employment decision too

remote in time will not be deemed comparable for purposes of the similarly situated analysis. Lee, 547 F.3d at 259. Likewise, employees who suffered an adverse employment decision due to factually distinct conduct will also be excluded from consideration. Id. at 259, 260. Instead, the plaintiff must proffer a comparator who held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, had an essentially comparable history of violations, and was disciplined or terminated due to nearly identical conduct. Id. at 260. Put another way, no presumption of discrimination is raised if the legitimate substantive, opposed to merely racial, differences between the plaintiff and proffered comparator adequately explain the disparate treatment. Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 221 (5th Cir. 2001) (citing Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 304-05 (5th Cir. 2000).

Thus, the fitness of a comparator has been considered sufficient for comparison when two train engineers held identical positions, compiled a similar number of moving violations over a similar period of time, the disposition of their ultimate employment status rested with the same person, and the respective disciplinary actions were handed down within approximately three months of each other. Lee, 574 F.3d at 261, 262. In Lee, the court examined the case of two train engineers, both of whom were initially terminated for failing to stop their respective trains at a stop signal. Each of the employees had also committed three previous moving infractions in recent history. Although the engineers were discharged by separate supervisors, both of their petitions for leniency and reinstatement were reviewed by the same third-party. This individual, despite the similar records of the employees, chose to reinstate the white comparator while

denying any relief to the African-American plaintiff. On such similar facts, the court found the two parties similarly situated so as to satisfy the plaintiff's prima facie case.

In contrast, the court has found a comparator's fitness lacking when the employees' positions were similar, both employees made inappropriate and colorably threatening remarks, but the plaintiff's remarks were deemed to have actually incited fear. Davin v. Delta Airlines, Inc., 678 F.2d 567, 571 (5th Cir. 1982)). Accordingly, this Court has so too found a proffered comparator inappropriate where the tendered party was employed in a different position and answered to a separate manager. In Hart v. Starkville Ford-Lincoln-Mercury, this Court held an employee too dissimilar when the proffered comparator was a body shop manager rather than a service manager, and was working in a different department with different responsibilities and answered to a different chain of authority. Hart, 2012 U.S. Dist. LEXIS 15916 *11 (N.D. Miss. Feb. 9, 2012).

In the case at hand, Crabb and Pharr initially proffered six African-American co-employees as potential comparators. Defendants responded by attacking each co-employee as an unfit comparator. Crabb and Pharr responded with general assertions of similarity, only specifically addressing the purported likeness of Teresa Easley and Dorothy Lattimore. Defendants argue, and this Court agrees, that in failing to attempt to rehabilitate the additional proffered comparators, both plaintiffs have waived any potential reliance on the other employees as possible comparators. Plaintiffs have completely failed to set forth briefing addressing the comparability between the plaintiff and other co-employees. See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim."); In re Cao, 619 F.3d 410, 435 (5th Cir. 2010) (noting that the role of the

court is "not to create arguments for adjudication" or "raise [them] like a Phoenix from the ashes[,]" but "rather, [the court's] role is to adjudicate the arguments with which [it is] presented."); Williams v. Valenti, 432 F. App'x. 298, 303 (5th Cir. 2011) (noting that the district court is not required to scour the record in search of evidence supporting a party's opposition to summary judgment."). Having failed to set forth any grounds for comparison between the plaintiffs and Kayla Coleman, Travis Grice, Felix Crump, and Cherlyn Adkinson, the Court regards them as waived for purposes of comparison and considers only Teresa Easley and Dorothy Lattimore to sustain the fourth prong of their prima facie cases.

Even in regard to Easley and Lattimore, however, Plaintiffs' analysis is scant at best. In determining whether a comparator is "nearly identical," the court is required to apply more than a superficial analysis. See Lee, 574 F.3d at259, 260 ("we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances") (quoting Little v. Republic Ref. Co., Ltd., 924 F.2d 93, 97 (5th Cir. 2001)). Instead, the court must flesh out the similarities and differences between the plaintiff and alleged comparator to determine whether the differences in treatment are sufficient to give rise to the presumption that the employer treated some employees less favorably based on their race. See id. at 260; Dodge v. Hertz Corp., 124 F. App'x 242, 244 (5th Cir. 2004) (per curiam) (rejecting premise that conduct was "nearly identical" when proferred infraction was also "dishonest" and instead requiring a heightened degree of analysis); Trotter v. BPB Am., Inc., 106 F. App'x 272, 276-77 (5th Cir. 2004) (per curiam) (finding that misconduct could not be generically compared when one offense arose from fighting with co-employees while the other arose from fighting with union president).

In the case at hand, Crabb and Pharr's proffered comparators Easley and Lattimore were employed as an Asset Protection Coordinator (APC) and a Department Manager, respectively. As the store APC, Easley was responsible for investigating store theft, be it external or internal. In carrying out her duties, Easley answered directly to Kim Stanley, the Market Asset Protection Manager for the store at issue. Lattimore, on the other hand, was an hourly employee charged with supervising the Electronics Department. Easley and Lattimore were found to have purchased merchandise from the Claims Department, allegedly marked below retail rates, before that merchandise was made available to customers. Stanley subsequently investigated the occurrences and recommended that the store demote Easley and discipline Lattimore. Although Shannon Moore, who was at that time stationed at a different position, assisted Stanley in the investigation, it is uncontroverted that Stanley retained full responsibility for the investigation and ultimately issued its conclusion. Key in her finding was the fact that while Wal-Mart found the purchases to be in violation of store policy, it was not internally defined as a theft of merchandise. Stanley reported these findings to Market Manager Sappington[2] and informed him that she had chosen to discipline, but not terminate the employees. Sappington's approval, however, was not required for this action. Additionally, the disciplinary action involving Easley and Lattimore occurred more than a year prior to the employment decision giving rise to the current litigation.

Crabb, on the other hand, was employed as a Customer-Service Manager (CSM). As a CSM, Crabb was responsible for filling in as a cashier when the check-out lines became too long, handling customer returns, and overseeing other various functions involved in the customer

---

[2] The Market Manager oversees store operations within a limited geographic area. Sappington was in charge of operations at eight stores.

check-out process.  Crabb was additionally responsible for ensuring that subordinate cashiers followed the Associate Purchases Policy.  Under this policy, "under-ringing," defined as ringing up merchandise for less than the actual retail price, is a terminable offense.  Crabb was investigated, and subsequently terminated, for five incidences of under-ringing that occurred within a month long span.[3]

Pharr was employed as an Assistant Store Manager.  As an Assistant Manager, Pharr supervised the electronics, photo, and wireless departments during the day.  When working after five p.m., however, Pharr was responsible for supervising the entire store.  She was therefore responsible for ensuring that store operations were in compliance with Wal-Mart procedure.  Crabb was investigated, and subsequently terminated, for receiving goods that had not been paid for on three different occasions within a month long span.

The investigations, unlike that of Easley and Lattimore, were spearheaded by Shannon Moore, who had replaced Stanley as the MAPM.  After an initial investigation by Moore, Crabb and Pharr were called in to discuss the alleged transactions with Moore and Beverly Garrison, the store Co-Manager.  Following the meetings, Moore made a recommendation to the Store Manager, Howard Brannon, that Crabb and Pharr be terminated.  The disciplinary action then fell to essentially a three-person committee.  In the case of Crabb, this committee was comprised of Sappington, Brannon, and Human Resources Manager Barnett.  As for Pharr, Sappington, Fulton Store Manager Michelle Clifton, and Human Resources Manager Barnett served on the committee. As the highest ranking manager involved in both decisions, Sappington was the de jure final decision maker.

---

[3] Pharr was only involved in three of the five transactions.

Plaintiffs argue that both Easley and Lattimore are suitable comparators in that they were similarly employed as "managers" at Wal Mart, under the general supervision of Store Manager Howard Brannon. Additionally, Plaintiffs argue that they are analogous in that they committed "similar acts of dishonesty." Although the court views Plaintiffs' suggestion that the proffered comparators were employed in nearly identical positions and committed nearly identical acts with a degree of skepticism, the court is unwilling to hold they are unfit for comparison based on these facts alone. Plaintiffs' contention is supported by the fact that under the Wal-Mart Policy, under-ringing merchandise, the very offense for which plaintiffs were disciplined, is defined as ringing up merchandise for less than the actual retail price. According to Crabb's testimony, the plaintiff's proffered comparators were sanctioned for transactions involving the purchase of underpriced merchandise. Additionally, it is well established that the "similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction…[o]therwise, an employer could avoid liability for discriminatory practices simply by coding one employee's violation different from another's." Lee, 574 F.3d at 261. The Court therefore finds little persuasion in Wal-Mart's assertion that the acts are completely discernible on grounds that the company policy defined one as theft, but not the other.

On the other hand, the court has rarely been pushed toward a finding of similitude merely because two employees are on the same hierarchical level in a corporate structure. As discussed in Lee, the department in which an employee works is highly relevant to a finding of similarity. Here, Crabb was employed as a CSM, unlike either of her proferred comparators. Her job title

and responsibilities varied significantly from those of Easley and Lattimore. Pharr, as Assistant Manager, significantly outranked her alleged comparators.

Additionally, the Court finds the comparators even more unsuitable for comparison when combined with additional differences. In order to merit comparison, the disciplinary action need generally have been recommended by the same party. The exception to such a general rule was articulated in <u>Lee</u>, where the Fifth Circuit found comparison apt despite the fact that the employees were terminated by separate supervisors. There, the employment decision in contention was not the decision to terminate, but the decision about whether to allow leniency and subsequently reinstate employment. The Fifth Circuit reasoned that because the decision regarding reinstatement was vested in a unitary decision-maker, the employees' situations could still be considered nearly identical. <u>Lee</u>, 574 F.3d at 262.

Here, however, the employees' alleged wrongful acts were investigated by separate parties and those separate investigators reached different conclusions concerning the appropriate action to take regarding the employees' futures with the company. The infractions of Easley and Lattimore were investigated by Stanley, while the purported wrongful acts of Crabb and Pharr were investigated by Moore. Although Moore assisted Stanley in interviewing Easley and Lattimore, Stanley maintained ultimate responsibility. Stanley recommended that Easley and Lattimore be disciplined and demoted, respectively, and the uncontroverted testimony shows that because the recommended course of action did not involve termination, Market Manager Sappington did not have to approve the action, but left it in the province of Stanley. Moore, on the other hand, recommended a termination of Crabb and Pharr that was then presented to a three-person panel for ratification. Pharr's panel consisted of Sappington, Barnett, and Clifton,

while Crabb's panel consisted of Sappington, Barnett, and Brannon. While it is true that all of the employees at issue worked, to some degree, under the general direction of Store Manager Brannon and Market Manager Sappington, the court has required more than theoretical supervisory authority to support a finding of nearly identical circumstances. See Lee, 574 F.3d at 259-60. As in Hart, the fact that the employees worked in different departments with individual management structures pushes the Court toward a finding of dissimilitude. Finally, as opposed to the less than three month time frame in Lee, the infractions were separated more than one year in the case at hand, greatly reducing their probative value.

Plaintiffs' reliance on the supervisory authority of Howard Brannon is further diluted by the fact that Howard Brannon was also issued a written warning for the infractions of Easley and Lattimore. Stanley, who investigated Easley and Lattimore, found it appropriate to additionally issue a warning to Brannon for a lack of oversight, finding that he shared culpability for their violations. Thus, the fact that Brannon, himself, was disciplined in the previous proceedings strains the notion that he was a decision-maker in that process.

Therefore, given the fact that Crabb and Pharr proffered comparators who worked in different departments, with different responsibilities, who committed separate and discernible offenses, who answered to separate supervisors, and whose disciplinary actions were investigated by separate parties, the Court finds that Crabb and Pharr are unable to proffer sufficient comparators and are thus unable to satisfy the fourth element of their prima facie case for discrimination.

Assuming, arguendo, that Crabb and Phar had established a prima facie case of § 1981 discrimination, the evidence they present is insufficient to show that Wal Mart's reasons for

dismissal were pretextual. If the employee is able to establish a prima facie case of discrimination, "the employer must rebut a presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action." Turner, 476 F.3d at 345. Identifying a legitimate basis for termination has been described as a burden of production rather than persuasion and thus involves no credibility assessment. McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007). If the defendant is able to make such a showing, the burden shifts back to the plaintiff to present substantial evidence that the employer's proffered reason for the termination was merely a pretext for discrimination. Turner, 476 F.3d at 345.

Crabb was employed as a CSM, responsible for generally overseeing the customer checkout process and acting as a resource for store cashiers. In carrying out her duties, she was governed by Wal Mart's Associate Purchase Policy. Crabb was suspected of "under-scanning," or rather scanning and then voiding out items, on five separate occasions. Wal-Mart investigated the suspected violations and elected to terminate her. Under the employee manual, underscanning was deemed a terminable offense. Pharr, on the other hand, was employed as an Assistant Store Manager. She too was governed by the Associate Purchase Policy, which was binding on employees even when only purchasing items from Wal-Mart. Wal-Mart suspected Pharr of taking merchandise without paying for it on several occasions and initiated an investigation into the incidents. Wal-Mart found that Pharr had intentionally taken the items without paying for them and decided to terminate Pharr.

Both Crabb and Pharr expend a significant portion of their briefs arguing that the factual findings of Wal-Mart—that they were engaged in underscanning—were erroneous. The court's

analysis at this stage, however, centers exclusively on whether the perception of the employee's performance or actions were the actual reason for her termination, not whether those perceptions were substantively true.  Laxton v. Gap Inc., 333 F.3d 572, 579 (5th Cir. 2003).  It is undisputed that Wal-Mart suspected Pharr and Crabb of stealing goods from the store, that they investigated those allegations, and that Wal-Mart then decided to terminate the two employees.  Wal-Mart has thus met its burden of producing a legitimate, non-discriminatory reason for terminating the employees.

Having done so, the burden then shifts back to the plaintiff to show that the legitimate reasons proffered were no more than a mere pretext for an actual discriminatory motive.  Brown v. CSC Logic, Inc., 82 F.3d 651, 54 (5th Cir. 1996).  In order to survive summary judgment, the plaintiff must advance facts to rebut each non-discriminatory reason advanced by the employer.  Wallace, 271 F.3d at 220.  It is necessary that the plaintiff produce more than subjective conclusions regarding the existence of a discriminatory motive.  Little v. Republic Ref. Co., Ltd., 924 F.2d 93, 96 (5th Cir. 1991)  (holding that a subjective belief of discrimination is simply insufficient for judicial relief).

Here, Crabb produces no additional facts, instead merely arguing:

[a] reasonable jury could conclude that had Crabb not been white, she would not have been fired for making an honest mistake.  Crabb has cited at least five examples of black employees engaged in acts of dishonesty that were not terminated.  A reasonable jury could conclude that Wal-Mart was afraid to discipline black employees the same as white employees for fear of being sued.

Pharr likewise regurgitates this reasoning, arguing, however, that had she not been white, she would not have been fired for doing nothing.

Plaintiffs' logic fails in that they have produced no comparators that support the conclusion that the alleged disparate treatment was due the difference in race rather than the differences in their jobs, responsibilities, alleged offenses, investigators, and decision makers. Further, both of plaintiffs' individual testimony that they were treated differently based on their race is unavailing as the court has held such hollow assertions are insufficient.  Brown., 82 F.3d at 658 ("[g]uesswork and speculation simply cannot serve as a basis for sending a case to a jury").  At the summary judgment stage, in order to rely on what a reasonable jury "could conclude," the plaintiff must first present evidence upon which such conclusions could be based. Id.

In support of their retaliation arguments, Crabb and Pharr place particular emphasis on certain statements regarding Wal-Mart's typical disciplinary procedures.  Specifically Crabb and Pharr point to LPC Ginn's statement that he was normally told to wait until theft, namely of cash from a cashier's till, reached five-hundred dollars before reporting the incident to his superiors. The Courts finds this unpersuasive on two separate grounds.  First, Ginn stated that the reason for this was that "five hundred dollars, the reason, that's felony…[y]ou know you're going to definitely be able to prosecute them, maybe get a little time."  The Court is not persuaded that Wal-Mart's interest in prosecuting employees for larceny or embezzlement somehow precludes them from initiating termination proceedings short of a felony violation.  Second, at the time Ginn's supervisor instructed him to commence the investigation, there was no way to know how much money was at issue due to the under-ringing.

The additional statement Plaintiffs place such reliance on is one allegedly made by Moore in which Ginn recalled him saying, "[w]ell it's going to look pretty good…[h]ere I am a

new MAPM coming into a new market…[and] I just took out an assistant manager."  Although perhaps distasteful, such statements amount to little in an employment discrimination claim absent the revelation of an improper motive.  Arey v. Watkins, 385 F. App'x 401, 404 (5th Cir. 2010) ("Discrimination law addresses only discrimination, not general unfairness in employment relationships.") (citing LeMaire v. La. Dep't of Transp. & Dev. ex rel Louisiana, 480 F.3d 383, 391 (5th Cir. 2007)).   Thus, although the interoffice politics of the Wal-Mart management structure may be objective to the Plaintiffs, they bear no significance on Crabb and Pharr's § 1981 claims.   Plaintiffs Crabb and Pharr have thus failed to offer any evidence to create a genuine dispute of material fact that Wal-Mart's reasons for termination were a pretext for the discrimination.

Finally, however, Crabb and Pharr argue that should they fail to rebut Wal-Mart's proffered legitimate non-discriminatory reason for termination, they should be entitled to the lesser evidentiary burden required under the mixed-motive exception. Under the mixed-motive framework, the plaintiff can recover even in the face of a legitimate non-discriminatory reason for termination when it can also be shown that the legitimate reason was accompanied by an illegitimate reason.  Rachid v. Jack in the Box, Inc., 376 F.3d 305, 309 (5th Cir. 2004).

In this Circuit, however, the mixed-motive framework has not yet been extended to § 1981 claims and it is unclear how far the Court's holding in Gross v.  FBL Fin. Serv., Inc., has scaled back the extension of the mixed-motive application. 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009); See Crouch v. JC Penney Corp., 337 F. App'x 399, 402, note 1 (finding that Gross "raises the question of whether the mixed-motive framework is available to plaintiffs alleging discrimination outside of the Title VII framework").   The mixed-motives framework's

applicability is further called into question by the decisions of other circuits that had previously addressed the question and found it inapposite in § 1981 claims even prior to the Court's holding in Gross. See Mabra v. United Food & Commercial Workers Local Union No. 1996, 176 F.3d 1357, 1357 (11th Circuit 1999) (comparing the language of both statutes and determining an extension of the mixed motives framework to § 1981 claim would be inappropriate); Aquino v. Honda of Am., Inc., 158 F. App'x. 667, 676 (6th Cir. 2005) ("Congress inserted the specific statutory provision [supporting the mixed-motive framework] only into Title VII…it did not amend § 1981 in an analogous fashion")).

Thus, this Court is not so presumptuous to assume that Plaintiffs here may necessarily rely on the mixed motive theory in support of their § 1981 claim. The Court is benefitted, however, by the fact that, even if available, plaintiffs Crabb and Pharr could not meet such a burden and the result is the same. The Court has before stated that the mixed-motives framework:

> is probably best viewed as a defense for an employer. This 'defense' allows the employer — *once the employee presents evidence that an illegitimate reason was a motivating factor*, even if not the sole factor, for the challenged employment action — to show that it would have made the same decision even without consideration of the prohibited factor.

Smith v. Xerox Corp., 602 F. 3d 320, 333 (5th Cir. 2010) (footnote and internal quotation marks omitted) (emphasis added). Here, however, plaintiffs have failed to put forth any evidence showing that the employer considered an illegitimate reason for termination as even a motivating factor. Thus, the Court dismisses the § 1981 discrimination claims of Crabb and Pharr.

### III.    § 1981 Retaliation

Section 1981 retaliation claims are governed by the same prima facie rubric as established for Title VII retaliation claims. Raggs v. Miss. Power and Light Co., 278 F.3d 463,

468 (5th Cir. 2002). Like Title VII and § 1981 discrimination claims, cases in which the plaintiff relies on indirect evidence are governed by the McDonell Douglas burden-shifting framework. Byers v. Dallas Morning News, Inc., 209 F.3d 419, 427 (5th Cir. 2000). Thus, the plaintiff must show that she was (1) engaged in protected activity, (2) subjected to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse employment actions. See Stewart v. Mississippi Transp. Comm'n, 586 F.3d 321, 331 (5th Cir. 2009) (applying McDonnell Douglas prima facie standard to Title VII retaliation claim). Defendants concede that (1) both Pharr and Crabb were subjected to adverse employment decisions, but dispute (2) whether Pharr was engaged in protected activity, and (3) whether either Crabb or Pharr can show a causal connection between such activity and their termination.[4] Defendant does not challenge that Crabb was engaged in protected activity under § 1981 as Wal-Mart concedes she reported the favorable treatment African-American associates were allegedly receiving. Because this Court finds the causal connection prong dispositive for both Pharr and Crabb, the Court disregards the disagreement between the parties concerning whether Pharr was engaged in protected activity.

The court has before outlined several indicia of causation, which may be relied upon when causation is less than obvious. Nowlin v. Resolution Trust Corp., 33 F.3d 498, 508 (5th Cir. 1994). The court has thus found persuasion in such factors as the employee's past disciplinary record, whether the employee followed its typical policy and procedures in

---

[4] To the extent Pharr contends her protected activity was appealing her termination through Wal-Mart's Open Door policy, the Court finds such conduct incapable of supporting a retaliation claim. Baker v. American Airlines Inc., 430 F.3d 750, 756 n. 5 (5th Cir. 2005) (determining that post-termination conduct will not ground a retaliation claim). Pharr's allegation that her discharge was in retaliation for the reporting of the favorable treatment African-American associates were receiving is examined in conjunction with Crabb.

terminating the employee, and the temporal proximity between the alleged protected action and the adverse employment decision. Id.

In regard to the first prong, it is undisputed that both Pharr and Crabb had clean disciplinary records with the company before the investigation into the under-scanning incident. Wal-Mart willingly concedes this point and contends that the plaintiffs' clean disciplinary records were considered during their investigation in the wrong-doing. Accepting the Plaintiffs' facts as true then, the Court takes into account the unblemished records of Crabb and Pharr. The court also notes, however, that protected activity does not allow the complainant "to disregard work rules or job requirements." See Swanson v. Gen. Serv. Admin., 110 F.3d 1180, 1188 n. 3 (5th Cir. 1997).

Secondly, the court has also indicated that whether the employer followed its typical policy and procedures in terminating the employee may be instructive. Nowlin, 33 F.3d at 508. In the case at hand, the misconduct alleged was explicitly prohibited in the employee hand book. Additionally, the handbook stipulated that a violation would constitute a terminable offense. Upon receiving a complaint of the potential violation, Wal-Mart conducted an investigation into the occurrences. As per typical practice, Wal-Mart then interviewed both of the plaintiffs regarding the employer's suspicions. Rather than pointing out a specific discrepancy between the employer's actual handling of the disciplinary procedures and those procedures outlined in the company policy, Pharr and Crabb attempt to rely on the testimony of Dewayne Ginn, who asserted that he was generally told to wait until employee theft reached $500 before initiating a terminable investigation. As previously mentioned, Ginn explained that the $500 threshold was to ensure that Wal-Mart could seek a felony prosecution for the theft. The plaintiffs contend that

in their case, the allegedly stolen merchandise only amounted to approximately $100 worth of merchandise.

Although Dewayne Ginn testified that *he was generally* told to wait until employee theft approached $500 before initiating an action, Ginn was not responsible for carrying out employee investigations to their completion or reaching a decision regarding disciplinary procedures. Ginn's primary responsibilities were to watch for shop-lifting as it occurred and to initially glean and pull evidence for further investigation. The Court notes that in the case at hand, Ginn was instructed to institute the investigation by Store Manager Brannon, who had received a tip from a co-employee. At the time of the initiation, there was no way for store management to know how much stolen merchandise was at issue. Ginn additionally testified that under-scanning was deemed a terminable offense under the employee handbook and he had seen other employees discharged for theft of less than $500. Additionally, Sappington and Moore both testified theft in excess of $25 was sufficient to support a discharge for theft. Further, Wal-Mart's typical post-termination avenues of appeal were made available to both Crabb and Pharr and they pursued such relief, albeit unsuccessfully. Even accepting Plaintiffs' contentions as true, there is an absence of evidence supporting the contention that Wal-Mart failed to comport with its procedures regarding employee theft of merchandise simply because they did not wait until the employees had allegedly stolen enough goods to constitute a felony.

Turning then to the final factor of indicia, close timing between an employee's protected activity and an adverse action against the employee may also provide the causal connection needed to make out a prima facie case of retaliation. Specifically, the court has noted that in

some circumstances a temporal gap of up to four months may provide the necessary inference of a causal connection. See Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001).

In the case at hand, the timing between alleged protected conduct and termination for both Crabb and Pharr fails to raise a suspicion of discriminatory intent, and if anything, strongly disfavors such a finding. Accepting the Plaintiff's allegations as true, Crabb made the vast majority of her complaints regarding disparate treatment of African-American associates in 2007 and 2008. She attests, however, that she also made additional complaints in early 2009. Although Crabb is unable to remember the exact dates of such conversations, she testified that they likely occurred around January of that year. It was not, however, until October of 2009 that Crabb was terminated. In her reply brief, Crabb urges that "although she cannot remember the exact dates she complained…there is no reason to believe she did not continue to complain up until the time she was terminated." The Court finds this unpersuasive and chooses instead to rely on Crabb's actual testimony for evidence of the time frame. Little, 37 F.3d at 1076 (holding that a dispute of material fact is not created by metaphysical doubt, conclusory allegations, or unsubstantiated assertions.). Thus, according to Crabb, her complaints likely occurred in January of 2009, approximately nine months before her termination. The Court, finding this well outside the very close temporal guide articulated in Evans, holds that Crabb is unable to show a causal connection based on temporal proximity.

Pharr's deposition is completely devoid of any testimony regarding complaints upon which a retaliatory action could have been grounded. Instead, she complains solely in regard to an open door meeting, which occurred after her termination. Pharr alleges that Wal-Mart filed embezzlement charges against her due to disparate treatment complaints raised in the open door

23

meeting. In response to Defendant's motion for summary judgment, Pharr abandons this open door allegation and instead argues that her termination was the product of a retaliatory motive triggered by complaints to fellow coworkers about the more favorable treatment African-Americans received. Pharr is unable to provide any dates for such complaints and relies solely on an Interrogatory response to support her claim. In that response, Pharr contends that "[o]n numerous occasions, Pharr complained about the preferential treatment blacks were getting in regards to breaks, and ringing each other up and discounting each other." Pharr attempts to create a genuine dispute of material fact regarding the temporal proximity of these alleged complaints by being unduly vague. In order to survive a motion for summary judgment, the plaintiff must provide more than conclusory allegations. TIG Ins. Co., 276 F.3d at 759. Pharr is therefore also unable to show a causal connection based on temporal proximity alone.

Thus, accepting the Plaintiffs' facts as true, Crabb and Pharr have shown no more than the fact that: (1) they had clean disciplinary records prior to the alleged under-ringing incident, (2) their terminations occurred within the company's terminable guidelines for theft, but before it reached felonious levels of misconduct, and (3) perhaps most persuasively, the terminations occurred almost nine months after their alleged protected activity. The Court finds that the vast proximity between the alleged protected activity and adverse employment actions is simply too much to overcome with such sparse evidence. Because Pharr and Crabb have failed to sufficient evidence supporting a causal relationship between their alleged protected activity and their terminations, the Court dismisses their retaliation claims.

## IV. State Law Retaliation

In <u>McArn v. Allied Bruce-Terminix Co.</u>, Inc., the court carved out a public policy exception to the general employment at will doctrine of Mississippi, establishing that "an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against his employer." 626 So. 2d 603, 607 (Miss. 1993). In order to meet such an exception, however, the plaintiff is required to prove that the conduct reported was actually criminal in nature. <u>Wheeler v. BL Development Corp.</u>, 415 F.3d 399, 402-04 (5th Cir. 2005). Thus, a good faith belief that the reported activity was illegal is simply insufficient to invoke the exception. <u>See</u> <u>Kyle v. Circus Circus Miss., Inc.</u>, 430 F. App'x 247, 247 (5th Cir. 2011). Further, the plaintiff need produce "substantial evidence or [a] citation to binding statutory and/or case law" in order to show the conduct's criminality. <u>Id</u>. at 252.

Additionally, the plaintiff need also present some evidence tending to establish causation between the reporting of the alleged misconduct and the decision process resulting in the discharge. <u>Dismuke v. City of Indianola</u>, 32 F. App'x. 126, * 4 (citing <u>Hust v. Forrest Gen. Hosp.</u>, 726 So. 2d 298, 301-02 (Miss. 2000). For instance, in <u>Kent v. Vicksburg Healthcare, LLC</u>, the court found summary judgment appropriate where the court was unable to determine that the decision maker was aware of the report of illegal activity and, even if the decision maker had been aware, there was no evidence to show that the decision to terminate was based on the complaints. 2012 WL 1556511, * 15 (S.D. Miss. April 30, 2012).

Crabb purports to have reported wrong-doing on two separate occasions that could support a viable <u>McArn</u> claim. In the first instance, she argues that she reported the mark-down

violations of Easley and Lattimore to loss prevention associate Dewayne Ginn. She contends that Ginn told her he passed this information on to Moore and Sappington. Defendant attacks such allegations as being incapable of supporting a McArn claim due to the fact that the reported incidents were not criminal. Crabb, in her reply, has failed to put forth any evidence controverting defendant's assertion and, as set forth in Kyle, her McArn claim based on this report fails.

In addition, though, Crabb also claims that she reported the theft of merchandise from a customer's buggy that occurred in the parking lot of the store and that this report should be sufficient to support her public policy claim. In Pharr's reply to defendant's motion for summary judgment, Pharr likewise contends she also reported the same theft of an item out of a customer's buggy committed by two co-employees. Because Plaintiffs rely so heavily on the significance of this report, the Court explores the facts giving rise to the reports in detail.

In early 2009, a female customer returned to Wal-Mart, complaining that she had left a router in her buggy and that it had thereafter been stolen. The patron suspected two African-American cart pushers of stealing it. According to Crabb, she and co-employee Ricky Johnson initially received the report from the customer and, in turn, passed the information to Ginn. She additionally claims to have written and signed a statement. Crabb contends that she and an assistant manager viewed the video of the alleged crime with Ginn, and that he stated he would report it to Moore. Pharr, meanwhile, states that she took the customer's name and gave the information to Ginn the next day, who allegedly told her he would turn it over to Howard Brannon. Ginn, on the other hand, states that he was able to find video evidence of the two African-American males finding the buggy with the merchandise in it and then evidence of them

returning the cart to the store empty. He could not, however, find evidence of the two African-American males actually taking the merchandise. Ginn, in his deposition, asserted that he was unaware of whether he had even told Moore about the incident because there "wasn't nothing to it really."

Because Crabb and Pharr have alleged retaliation based on the reporting of illegal activity only for the instance involving potential theft from a customer's buggy, the Court concerns itself only with whether the decision makers involved in the termination action were aware of those specific reports and whether there is any evidence to support a causal connection. In her deposition, Crabb initially states that Shannon Moore, who recommended that she be terminated, would have known that she reported the instances of theft only if Ginn told him. She could not testify, however, as to whether he had indeed done so. Later, though, she testified that she had filled out a report with Ginn and Moore would have seen such when he reported the incident up. Similarly, Pharr claims to have also reported the incident to the Loss Prevention Coordinator, Ginn. Neither could she testify that Ginn had made Moore aware of who submitted the reports. Ginn, during his own testimony, claimed that he had been unable to find sufficient evidence of theft and had thus terminated the investigation. He recalled informing his supervisors that he had been unable to find sufficient evidence and did not attest to having filed a formal report. Moreover, Crabb readily admits that a third-party, Ricky Johnson, was also involved in submitting the allegations of theft and that he remained under the employ of Wal-Mart. Johnson's presence during the report is significant in that it belies Plaintiffs' theory that they were terminated for reporting the alleged theft.

Thus, Crabb and Pharr have produced no more than conclusory allegations regarding the decision makers' knowledge of the complaints.  Additionally, their claim is further burdened by the fact that they have produced absolutely no evidence to support the finding that Moore or Sappington relied, even in part, on those reports when deciding to terminate the employees. Based on the fact that Pharr and Crabb have produced little evidence tending to support the naked assertion that the decision makers were aware of their reports, that they have produced no other evidence tending to support the finding that their termination was based on such reports, and the fact that a third-party submitting the report remained under the employ of Wal-Mart, the Court finds that there is no evidence supporting the inference that Crabb and Pharr were terminated in retaliation for their reports of theft.  Therefore, the Court grants summary judgment in favor of the Defendants as to this claim.

## **CONCLUSION**

For the reasons stated above, Defendants' Motions for Summary Judgment are granted regarding Plaintiffs' Title VII discrimination claims, § 1981 discrimination claims, § 1981 retaliation claims, and state-law based wrongful termination claims.  Thus, the Court need not reach the parties' arguments concerning back-pay.

So ORDERED on this, the 17th day of September, 2012.

**/s/  Sharion Aycock                          ____**
**UNITED STATES DISTRICT JUDGE**